TODD BLANCHE
Acting Attorney General
BILAL A. ESSAYLI
First Assistant United States Attorney
ALEXANDER B. SCHWAB
Assistant United States Attorney
Acting Chief, Criminal Division
STEPHEN CHANG (Cal. Bar No. 312580)
MARK K. KANOW (Cal. Bar No. 323681)
Assistant United States Attorneys
General Crimes Section
3403 Tenth Street, Suite 200
Riverside, California 92501
Telephone: (213)894-7280 / 7207
E-mail: stephen.chang@usdoj.gov
Mark.kanow@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>CARLOS JIMENEZ,<br><br>Defendant. | No. 5:25-cr-00366-KK<br><br><u>JOINT STATUS REPORT PURSUANT TO THE COURT'S SCHEDULING ORDER ISSUED APRIL 24, 2026.</u> |

Plaintiff United States of America, by and through its counsel of record, the First Assistant United States Attorney for the Central District of California and Assistant United States Attorneys Stephen Chang and Mark Kanow, and Defendant Carlos Jimenez, by and through his counsel of record, Deputy Federal Public Defenders Ayah Sarsour and Chad Pennington, hereby submit the following Joint Status Report pursuant to the Court's Order. ECF No. 62.

Dated: April 29, 2026

Respectfully submitted,

TODD BLANCHE
Acting Attorney General
BILAL A. ESSAYLI
First Assistant United States Attorney

ALEXANDER B. SCHWAB
Assistant United States Attorney
Acting Chief, Criminal Division

/s/
STEPHEN CHANG
MARK K. KANOW
Assistant United States Attorney

Attorneys for Plaintiff
UNITED STATES OF AMERICA

Dated: April 29, 2026

Respectfully submitted,

CUAHTEMOC ORTEGA
Federal Public Defender

/s/
AYAH SARSOUR
CHAD PENNINGTON
Deputy Federal Public Defenders

Attorneys for Defendant CARLOS JIMENEZ

# I. INTRODUCTION

On April 9, 2026, the defense filed a motion to compel the government's production of outstanding, material discovery. ECF No. 53. On April 24, 2026, the Court ordered the parties to file a joint status report addressing: (1) the issues that have been resolved and a timeline for production of any outstanding discovery; and (2) to the extent there are remaining issues in dispute, the issues outstanding and each parties respective positions, including a timeline for production. ECF No. 62.

Defendant's Request

The defense has requested production of the remaining disputed items by Thursday, April 30, 2026, in advance of the Thursday, May 7, 2026, motion deadline, to ensure sufficient time to review the materials and prepare appropriate motions. Many of these requests date back to November 2025, and despite multiple meet-and-confer efforts, the government has yet to produce the requested discovery.

Government's Introduction:

The law governing criminal discovery arises primarily from three sources. First, Federal Rule of Criminal Procedure Rule 16 establishes guidelines for pretrial production by the government of certain limited materials. Second, under Brady v. Maryland, 373 U.S. 83 (1963), and its progeny, the government is obliged to turn over to the defense evidence in its possession that is exculpatory or favorable to the defendant. Finally, under 18 U.S.C. § 3500 (the Jencks Act) and Rule 26.2, both parties must disclose prior statements by witnesses after the witness has testified. None of these sources authorize "fishing expeditions" or sweeping discovery requests, nor do they require the government to disclose information

before it is even within the government's possession, custody or control. See United States v. Bagley, 473 U.S. 667, 675 (1985); see also United States v. Agurs, 427 U.S. 97, 106 (1976) ("there is, of course, no duty to provide defense counsel with unlimited discovery of everything known by the prosecutor").

The government disagrees with Defendant's hyperbole in its characterization of its discovery efforts. The government has complied with, and will continue to comply with, each of these discovery obligations and has produced the discoverable material responsive to defendant's requests.

Defendant's Introduction:

On April 28, 2026, the parties met and conferred for approximately 90 minutes regarding the parties' discovery disputes regarding the motion to compel. During the conference, the defense learned of concerning discovery practices that it wishes to bring to the Court's attention. This discovery dispute arises from the government's improper and unilateral restriction of its disclosure obligations through the creation of two artificial categories of evidence: a "discoverable" set and an "undiscoverable" set, and that the vetting of discovery in this matter by the government has been contingent on supervisory approval. Indeed, the government confirmed the existence of separate text messages that it deemed non-discoverable because they related to logistics. Rather than complying with its constitutional and rule-based duties, the prosecution has arrogated to itself the role of gatekeeper—producing only those materials it subjectively deems relevant to the defense while withholding the remainder of plainly responsive information.

That approach is contrary to fundamental principles of criminal discovery. The government's obligations under *Brady v. Maryland*, 383 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1970), and Criminal Procedure Rule 16 are not limited to evidence the prosecution believes will be useful to the defense. Nor do those obligations depend on disclosure of the defense theory. To the contrary, the prosecution should not be permitted to look at the case through its own eyes and decide what is material or exculpatory. The duty to disclose extends to all material, favorable, and impeaching information—and must be discharged broadly, not grudgingly.

Moreover, the government's approach here misapprehends its basic discovery obligations. The government must produce material not only as it relates to trial, but also early enough so that the defense may investigate matters and develop a defensive theory. The defense sought the agents' communications on November 5, 2025, and texts specifically on December 2, 2025. As late as March of 2026, the government declined production of any text messages. Only recently did it produce a limited portion of text messages, and only yesterday, nearly five months later, did it acknowledge there were still more texts available. The government did, to its credit, after the meeting yesterday, agree to produce what it calls logistical texts, but there was no reason any texts were not produced when requested on December 2, 2025, or after several rounds of written requests and written conferencing. The government cannot move at the glacial pace of no texts, to some texts, to more texts, based on a policy of two sets of discovery – discoverable and undiscoverable.

Here, the government has produced a curated subset of materials while withholding entire categories of responsive evidence, including

communications, operational directives, and agency policies central to the events at issue. In doing so, the prosecution has effectively conditioned discovery on its own, undisclosed assessment of what it has concluded might matter to the defense—despite having no knowledge of the defense theory and no authority to limit disclosure on that basis. This selective production not only undermines the adversarial process, but also deprives the defense of the ability to investigate the facts, test the government's narrative, and prepare for trial. This is the government's prosecution and burden, it may not wait to produce material until it such material cannot be used by the defense to prefect a defensive theory.

The Court's intervention is therefore required. The government must be ordered to abandon its improper bifurcation of discovery, conduct a thorough and good-faith search for all responsive materials, and produce the full scope of discoverable evidence to which the defense is entitled.

**As stated above, the defense has requested production of the remaining disputed items by Thursday, April 30, 2026, in advance of the Thursday, May 7, 2026, motion deadline, to ensure sufficient time to review the materials and prepare appropriate motions.**

## I. Remaining Issues in Dispute

*2. all communications, including but not limited to text messages and e-mails, by any officer, agent, or other government official, relating to this incident. The government has produced a small amount of discovery responsive to this request, but it has failed to produce the entirety of the responsive discovery and, notably, failed to produce immigration officer Ortiz's text messages;*

<u>Defendant's Position:</u>

The requested communications—including text messages, emails, and other electronic correspondence of all officers, agents, and

government officials involved—are plainly discoverable because they are material to the defense and directly relevant to the central issues in this case, including use of force, credibility of government witnesses, and the sequence of events leading to the alleged assault.

First, contemporaneous communications are uniquely probative of what officers perceived, intended, and reported about the incident. Such communications often contain candid, real-time descriptions that differ from later formal reports or testimony. Where, as here, the defense is entitled to challenge the justification for the use of force and the government's characterization of the encounter, these materials fall squarely within the government's obligations under *Brady*, *Giglio*, and Rule 16.

Second, the government's production to date is facially incomplete. While some responsive materials have been disclosed, the government has failed to produce entire categories of highly relevant communications—most notably, Immigration Officer Ortiz's text messages. Given that text messaging is a primary means of communication among law enforcement officers during and immediately after incidents, the absence of these materials strongly suggests that responsive discovery is being withheld or has not been adequately searched for or preserved.

Third, these materials are critical to impeachment. Any inconsistencies between officers' contemporaneous communications and their later reports or testimony would constitute classic *Giglio* material. Courts have repeatedly recognized that informal communications—particularly text messages—may reveal bias, coordination of narratives, or materially different accounts of an

incident. In a case involving a shooting by a federal agent followed by assault charges against the defendant, credibility is a central issue, and the defense is entitled to explore it fully.

Finally, the need for full disclosure is heightened where the government's version of events is disputed and depends heavily on law enforcement testimony. In such circumstances, courts routinely compel production of all related communications to ensure due process and a fair opportunity to present a defense.

For these reasons, the defense respectfully requests that the Court order the government to conduct a thorough search for and produce all responsive communications, including but not limited to Officer Ortiz's text messages, and to confirm that all such materials have been preserved and disclosed.

The government's production pace here is consistent with the larger discovery challenges plaguing Sec. 111 cases nationally. In *United States v. Villegas-Alvarez*, the government contested production on admissibility grounds under Federal Rule of Evidence 403. *See United States v. Villegas-Alvarez*, 2:25-cr-219, ECF No. 44 at 6. (D. N.J. 20025). However, as noted in that case "if the government plans to argue admissibility, it may move in limine to exclude" such evidence, but [w]hat the government" but what "cannot do is argue that it thinks it will prevail on a challenge to admissibility" under the Federal Rules of Evidence and "use that as a basis to fail to produce discovery to which" the defendant is entitled. *Id.* Indeed, the *Villegas-Alvarez* matter was dismissed after the defense, the government delayed, production of workers' compensation records, the same records that the defense has requested in a separate request here.

To that end, at the April 28, 2026, conference, the government again represented that immigration officer Ortiz has not a single responsive text message as requested by the defense. And, it refuses to produce the metadata to support immigration officer Ortiz’s claim. Facially, the government's claim that officer Ortiz, to the exclusion of all other officers has no responsive text messages, is simply not believable. The government has produced declarations that there are no other text messages, but in case after case in the context of Sec. 111 claims, immigration officers' representations are Laer found to be false or misleading. The government does not represent that it has conducted any independent metadata review of immigration officer Ortz’s assertion (or any immigration officer’s assertions on text volume). If there are no responsive text messages on Ortiz’s phone, a metadata production and review is not an unreasonable request given the posture of these cases nationally. The government here argues this is the one the case where immigration officers’ representations are unqualifiedly true in the Sec. 111 context. Given the diverging text productions and its own stated policy of having two sets of investigatory materials, it is simply not entitled to the benefit of the doubt. If immigration officer Ortiz has no text messages, metadata should be reviewed to test that assertion. Courts have routinely granted text message production in these matters as set forth in Mr. Jimenez’s motion to compel.

Government’s Position:

The government has produced the discoverable material it is aware of that is responsive to this request. As discussed in the Opposition (Dkt. 60), on April 6, 2026, HSI Special Agent E. Mejia met with CBP officers S. Cosey and N. Jimenez at the ICE Field Office

in San Bernardino, California. (Decl. of Elisha Mejia ("Mejia Decl.") ¶ 5.) He recorded videos of the officers' messages relating to the incident involving defendant, which involved a group text message thread with officers including S. Cosey, N. Jimenez, and Special Agent Mejia. (Id. ¶¶ 6-7.) In addition to the text thread, agent Mejia also obtained a chain of messages from the messaging application Signal in which he and other HSI investigators discussed the incident. Screenshots of the videos and the videos of the messages were provided to defense counsel on April 6, 2026. (Mejia Decl. ¶ 8).

As also set forth below in response to Nos. 11 and 12, officer Ortiz does not have text messages related to the incident or JIMENEZ. Defense counsel requested in its motion that the government "conduct reasonable inquiries of immigration officer Ortiz." (Mot. at 18.) It has already done so. On February 10, 2026, the same day that videos of the other text messages were taken of Officer S. Cosey and N. Jimenez's phones, Special Agent Mejia also met with Officer Ortiz in person and reviewed his device and text messages. (Mejia Decl. ¶ 10.) Special Agent Mejia first verbally confirmed with Officer Ortiz that he had no messages. (Id.). Special Agent Mejia then performed a general review of the text messages in Officer Ortiz's government phone, searched specifically for the name Jimenez, and in particular reviewed all messages from October 30 and 31, and did not locate any text messages about the incident or Jimenez. (See id. ¶ 10). This is not particularly surprising given that Officer Ortiz was not part of the group text thread that officers S. Cosey, N. Jimenez, and Special Agent Mejia were a part of, and because Officer Ortiz did not create a group text for the operation he led on October 30, 2025. (Id. ¶

10.) Special Agent Mejia also confirmed with Officer Ortiz that he had not deleted messages on his government phone and that he had no such practice of doing so. (Id. ¶ 11.)

The government also is in possession of additional text messages that do not constitute Rule 16 or *Brady* materials. Such messages discuss logistical matters such as dates, times, and locations of interviews; officer contact information; and the collection of documents that the government has since produced to the defense. Although the government does not believe it is obligated to produce these messages, it has agreed to provide such text messages to the defense as a courtesy and intends to produce the messages by April 30, 2026.

*3. Any written group communications (including text messages and similar communications), operations directives, or disseminated memoranda regarding HSI/CBP/ICE/ERO operations in the City of Ontario and in San Bernardino County on October 28, 2025, through November 5, 2025;*

Defendant's Position:

The defense seeks production of all written group communications—including text messages and similar communications—as well as operational directives and disseminated memoranda concerning HSI, CBP, ICE, and ERO operations in the City of Ontario and San Bernardino County during the period of October 28, 2025, through November 5, 2025. These materials are directly relevant, material to the preparation of the defense, and fall squarely within the government's disclosure obligations.

First, the requested materials go to the heart of how and why federal agents were operating in the area at the time of the incident. The shooting at issue occurred during an active immigration

enforcement operation involving multiple federal agencies in Ontario, California. Additionally, the current discovery reveals that there were immigration operations preceding the incident in question on that same day. The existence of coordinated enforcement activity during this time period makes it highly likely that formal and informal communications—such as operational plans, briefings, group texts, and post-operation summaries—were generated and disseminated among agents.

Second, these materials are critical to evaluating the lawfulness, scope, and execution of the operation that led to the shooting. Operational directives and memoranda may reveal: (1) the objectives of the enforcement action; (2) the identities and roles of participating agents; (3) instructions regarding use of force; (4) coordination between agencies; and (5) whether agents complied with or deviated from established protocols. Such information bears directly on the reasonableness of the force used and the credibility of the government's version of events.

Third, group communications and internal messaging are uniquely probative of contemporaneous perceptions and potential coordination among agents. As with individual officer communications, these materials may contain real-time descriptions, instructions, or discussions that differ from later reports or testimony. Any inconsistencies would constitute classic impeachment material under *Giglio*, and any exculpatory information must be disclosed under *Brady*.

Fourth, the requested timeframe is narrowly tailored to the period immediately surrounding the incident and is justified by evidence that enforcement activity was not isolated to a single

moment, but part of broader, coordinated operations in the region. Reports of multiple enforcement actions and heightened activity in the Inland Empire during this period further underscore the likelihood that relevant communications exist and have not yet been produced.

Finally, to the extent the government has produced limited discovery, it has not included the full universe of operational communications, directives, or memoranda responsive to this request. Without these materials, the defense is deprived of the ability to fully investigate the circumstances of the operation, challenge the government's narrative, and present a complete defense.

For these reasons, the defense respectfully requests that the Court order the government to conduct a thorough search for and produce all responsive group communications, operational directives, and memoranda for the specified time period, and to confirm that all such materials have been preserved and disclosed.

Government's Position:

The Government is not aware of further discoverable material responsive to this request.

*4. Information regarding any oral directives disseminated regarding HSI/CBP/ICE/ERO operations in the City of Ontario and in San Bernardino County on October 28, 2025, through November 5, 2025;*

Defendant's Position:

The defense seeks disclosure of information regarding any oral directives disseminated in connection with HSI, CBP, ICE, and ERO operations in the City of Ontario and San Bernardino County during

the period of October 28, 2025 through November 5, 2025. This information is discoverable because it is material to the preparation of the defense and directly relevant to the planning, execution, and evaluation of the operation that culminated in the shooting at issue.

First, oral directives are a routine and integral component of coordinated law enforcement operations, particularly those involving multiple federal agencies and rapidly evolving field conditions. The incident occurred during an active, multi-agent immigration enforcement operation in Ontario involving a traffic stop that escalated into a shooting. In such circumstances, it is highly likely that supervisors and agents issued verbal briefings, tactical instructions, and real-time commands that governed agent conduct before and during the encounter.

Second, these oral directives are critical to assessing the reasonableness and lawfulness of the agents' actions. Verbal instructions may address key issues such as: the objectives of the operation; identification of targets; permissible tactics; de-escalation protocols; and use-of-force guidance. Whether agents complied with—or deviated from—those directives bears directly on the central issues in this case, including the justification for the use of force and the credibility of the government's account.

Third, information regarding oral directives is necessary to test and contextualize the government's written discovery. To the extent the government has produced reports, memoranda, or limited communications, those materials may omit or sanitize the actual instructions given in the field. Courts recognize that informal or unwritten communications—including verbal orders—may reveal materially different accounts of events, inconsistencies, or after-

the-fact rationalizations. Such discrepancies constitute classic impeachment material under *Giglio*, and any exculpatory content must be disclosed under *Brady*,

Fourth, the importance of these materials is heightened in light of conflicting accounts surrounding the incident. While federal officials have characterized the shooting as defensive, other accounts have raised serious questions about the circumstances leading up to the use of force. Where the government's case relies heavily on agent testimony, the defense is entitled to probe the actual instructions and directives that shaped that testimony.

Finally, the request is narrowly tailored in both subject matter and time frame to the specific operation and surrounding period. To the extent the government contends that oral directives were not memorialized, it remains obligated to disclose the substance of those directives, including through witness statements, reports, or other documentation reflecting what instructions were given and by whom.

For these reasons, the defense respectfully requests that the Court order the government to disclose all information regarding oral directives issued in connection with the specified operations, including the substance of such directives, the individuals who issued them, the recipients, and any efforts to memorialize or record them.

<u>Government's Position:</u>

The government has produced materials that discuss the operation, such as written reports. The government is not aware of further discoverable materials responsive to this request.

*5. A copy of the current HSI/CBP/ICE/ERO employee manual(s) to*

*include any manuals regarding the following topics: use of force, and effecting warrants and arrests;*

Defendant's Position:

The defense seeks production of all current HSI, CBP, ICE, and ERO employee manuals, including but not limited to manuals governing use of force and the execution of warrants and arrests. These materials are plainly discoverable because they are directly relevant to the central issues in this case—namely, the lawfulness of the force used, the conduct of the involved agents, and the credibility of the government's account.

First, agency policies governing use of force are critical to evaluating whether the conduct of Immigration Officer Ortiz and other agents complied with governing standards. Courts routinely recognize that internal law enforcement policies are highly probative where, as here, the case involves a use of force that forms the basis of criminal charges against the defendant. These materials bear directly on whether the agents' actions were consistent with training, policy, and constitutional limits, and thus are material to both the defense theory and cross-examination.

Second, the government's production is demonstrably incomplete. The government produced ICE Directive 19009.3 (Firearms and Use of Force), but that directive expressly incorporates and relies upon the ICE Firearms and Use of Force Handbook, which establishes the detailed procedures, protocols, and guidance governing agent conduct. The directive itself makes clear that it operates "in conjunction with the ICE Firearms and Use of Force Handbook" to define training requirements, reporting obligations, and operational standards. Yet the government has failed to produce that handbook.

This omission is significant. The handbook is not ancillary—it contains the operative rules that agents are trained on and expected to follow in the field, including specific guidance on when and how force may be used. ICE's use-of-force framework is comprised of both the directive and the accompanying handbook, which together establish agency-wide rules and limitations on the use of force. Producing only the high-level directive while withholding the detailed implementing handbook deprives the defense of the very materials necessary to assess compliance.

Third, the absence of ICE-specific policies is particularly problematic given that the involved officer, Ortiz, was an ICE agent. While the government has produced some CBP and DHS materials, those do not substitute for ICE's own governing policies. Each agency maintains its own standards, training protocols, and operational guidance. Without ICE's manuals—especially the Firearms and Use of Force Handbook—the defense cannot meaningfully evaluate whether Ortiz acted within or outside the scope of his training and authority.

Fourth, these materials are essential for impeachment and cross-examination. Any deviation from agency policy, training, or required procedures would constitute powerful impeachment evidence under *Giglio*,. Likewise, any policy provisions that limit or constrain the use of force may be exculpatory under *Brady* if they undermine the government's theory that the agent's conduct was justified.

Finally, the request is narrowly tailored to current policies governing use of force and arrests—core issues in this case. The government cannot meet its disclosure obligations by producing partial or high-level documents while withholding the detailed manuals that operationalize those policies.

For these reasons, the defense respectfully requests that the Court order the government to produce all responsive manuals, including but not limited to the ICE Firearms and Use of Force Handbook, and to confirm that all such materials have been disclosed in full and without omission.

Government's Position:

The government has produced to defense use of force policies from DHS, CBP, and ICE-ERO. The government has requested from ICE-ERO and policy materials relating to the defense's requests and continues to confer with ICE-ERO to identify further documents responsive to defense's request, if any. The government expects to produce additional materials, such as the ICE Use of Force Handbook, by April 30, 2026.

*6. All discovery pertaining to the HSI/CBP/ICE/ERO policies regarding the use of government vehicles in arrest matters and effectuating arrests;*

Defendant's Position:

The defense seeks all discovery pertaining to HSI, CBP, ICE, and ERO policies governing the use of government vehicles in arrest operations and the execution of arrests. These materials are directly relevant, material to the preparation of the defense, and necessary to evaluate the conduct of the involved agents in this case.

First, policies governing the use of government vehicles are central to the factual circumstances of the incident. The shooting at issue arose during a vehicle stop conducted as part of an immigration enforcement operation, in which agents used vehicles to block, approach, or otherwise control the target vehicle. The manner in which agents deploy their vehicles—including positioning, blocking

techniques, approach tactics, and escalation protocols—is governed by agency policy and training. These policies directly bear on whether the agents created, contributed to, or escalated the circumstances that led to the alleged assault and subsequent use of force, especially in the absence of any video recorded evidence.

Second, these materials are critical to assessing the reasonableness and lawfulness of the agents' actions. Vehicle-based arrest tactics—such as boxing in a suspect vehicle, conducting high-risk stops, or approaching with weapons drawn—carry inherent risks and are typically subject to detailed policy guidance and limitations. Whether agents complied with or deviated from those policies is directly relevant to whether the encounter was conducted in a reasonable manner and whether the government's characterization of the incident is accurate.

Third, the requested materials are essential for impeachment and cross-examination. Any deviation from established vehicle-use protocols, training, or safety requirements would constitute powerful impeachment evidence under *Giglio*. Likewise, any policies that restrict or caution against certain vehicle tactics may be exculpatory under *Brady* if they undermine the government's theory that the agents acted appropriately or that the defendant's conduct constituted an assault.

Fourth, the government's production appears incomplete. While some general policies from DHS or CBP may have been disclosed, the defense has not received the full set of agency-specific policies governing ICE and HSI vehicle use in arrest operations. As with use-of-force policies, each agency maintains its own operational guidance, and ICE-specific materials are particularly critical given

that the involved agent, Ortiz, was an ICE officer. General DHS policies do not substitute for the detailed, agency-level directives and training materials that govern actual field conduct.

Finally, the request is narrowly tailored to a specific category of policies—vehicle use in arrest contexts—that is directly implicated by the facts of this case. Without these materials, the defense cannot fully investigate whether the agents adhered to governing standards, challenge the government's narrative, or present a complete defense.

For these reasons, the defense respectfully requests that the Court order the government to produce all responsive policies, directives, manuals, and training materials governing the use of government vehicles in arrest operations, and to confirm that all such materials have been fully disclosed.

Government's Position:

See response to No. 5 above.

*7. All written and oral communications between the San Bernardino Sheriff's Department and any responding Ontario City Police Officers and HSI/CBP/ICE/ERO in advance, during, and after Mr. Carlos Jimenez October 30, 2025, arrest.*

Defendant's Position:

The defense seeks all written and oral communications between the San Bernardino County Sheriff's Department, Ontario Police Department, and HSI/CBP/ICE/ERO before, during, and after the October 30, 2025, arrest of Mr. Carlos Jimenez. These materials are directly relevant, material to the preparation of the defense, and necessary to establish the full scope and context of the law enforcement activity that culminated in the shooting and subsequent charges.

First, the incident at issue was not conducted in isolation by a single agency. Local law enforcement—including Ontario Police—was present at the scene alongside federal agents, providing support such as traffic control and scene security during the operation. The involvement of multiple agencies makes it highly likely that there were coordinated communications both before and during the operation, including planning discussions, real-time updates, and post-incident coordination. These inter-agency communications are essential to understanding how the operation was structured, who was directing it, and what information was shared among responding officers.

Second, these materials are critical to reconstructing the sequence of events and assessing the credibility of the government's narrative. The government has characterized the shooting as defensive, asserting that Mr. Jimenez attempted to use his vehicle to harm officers, while other accounts sharply dispute that version of events. Communications between agencies—particularly contemporaneous radio traffic, text messages, dispatch logs, and verbal briefings—may reveal what officers actually perceived in real time, whether there were inconsistencies in reporting, and whether accounts were later aligned or modified. Such evidence goes directly to both to the legality of the use of force and the officers' credibility.

Third, inter-agency communications are uniquely probative of coordination, command structure, and potential escalation. These materials may reveal: (1) which agency had operational control; (2) what instructions were given to local officers assisting federal agents; (3) whether local officers observed or reported facts inconsistent with federal agents' accounts; and (4) how the scene was managed immediately after the shooting. This information is

particularly important where, as here, the defense contends that the circumstances leading to the alleged assault were shaped—or escalated—by law enforcement actions.

Fourth, these materials are essential impeachment and exculpatory evidence. Any inconsistencies between statements made to or by local law enforcement and the federal agents' reports or testimony would constitute classic impeachment material under *Giglio v. United States*. Likewise, any communications reflecting doubt, uncertainty, or contradictory observations regarding the events would be exculpatory under *Brady*.

Finally, the government's disclosure obligations extend to information in the possession of the prosecution team, including cooperating agencies. Where federal agents worked in conjunction with local law enforcement, the government cannot avoid its discovery obligations by failing to obtain and disclose communications held by those agencies. The request is narrowly tailored to a single incident and directly related time period, and it seeks materials that are indispensable to a fair adjudication of the case.

For these reasons, the defense respectfully requests that the Court order the government to obtain and produce all written and oral communications between the identified agencies relating to the incident, including but not limited to dispatch records, radio transmissions, text messages, emails, reports, and any summaries or memorialization of verbal communications, and to confirm that all such materials have been preserved and disclosed.

<u>Government's Position:</u>

The government produced discoverable material responsive to this request in its first production on December 1, 2025. *See*

USAO_00000560 (Ontario report). On the April 28, 2026 meet and confer call, defense asked specifically about whether there are CAD dispatch logs. The government had already produced reports that discuss the dispatch calls for the incident. *See* USAO_00000560 (Ontario report). On April 29, 2026, the government reached out and obtained the CAD dispatch log, which it will plan to produce on April 30, 2026.

> *8. All interagency emails, correspondence, communications, reports, or memoranda relating to Mr. Carlos [Jimenez] or the incident regarding Mr. Carlos [Jimenez];*

<u>Defendant's Position:</u>

The defense seeks all interagency emails, correspondence, communications, reports, and memoranda relating to Mr. Carlos Jimenez or the incident involving Mr. Jimenez. These materials are directly relevant and material to the preparation of the defense because they bear on how multiple agencies understood, coordinated, and documented the events that culminated in the shooting and subsequent charges.

First, interagency communications are likely to contain contemporaneous descriptions of the incident, discussions of operational decisions, and assessments of Mr. Jimenez's conduct that may differ from formal reports or trial testimony. Such information falls squarely within the government's obligations under *Brady* (exculpatory evidence), *Giglio* (impeachment material), and Rule 16 (materials material to the preparation of the defense).

Second, because this operation involved HSI, ICE/ERO, CBP, and local law enforcement, interagency communications may reveal who exercised operational control, what information was shared across

agencies, and whether any agency personnel raised doubts or concerns about the justification for the use of force. Any inconsistencies or omissions between those communications and the government's current narrative are classic impeachment material and therefore must be disclosed.

Third, to the extent the government has produced only a subset of such communications, that production is facially incomplete. The prosecution team's disclosure obligations extend to information in the possession of federal and cooperating agencies; it may not avoid discovery by limiting its search to a narrow set of custodians or by ignoring known interagency channels.

For these reasons, the defense respectfully requests that the Court order the government to conduct a thorough search for, and produce, all interagency emails, correspondence, communications, reports, and memoranda relating to Mr. Jimenez or the incident, and to confirm that all responsive materials within the possession, custody, or control of the prosecution team and cooperating agencies have been preserved and disclosed.

Government's Position:

The government has produced material responsive to this request, including investigative reports, notes, recordings, photographs, videos, which included an export of the FBI's Sentinel evidence system, and other materials.

*10. All communications conducted on both government and personal phones in the possession by all agents involved in the investigation related to the incident*

Defendant's Position:

The defense seeks production of all communications conducted on both government-issued and personal phones by all agents involved in the investigation and incident. These communications are material to the defense because they may contain contemporaneous observations, instructions, and reactions that differ from official reports and are central to assessing credibility, use of force, and the sequence of events.

First, agents routinely use both government and personal devices for calls, text messages, and messaging applications during operations. Communications about the incident do not cease to be discoverable simply because they took place on a personal phone; if agents used personal devices to communicate about the operation, those communications are within the scope of *Brady*, *Giglio*, and Rule 16.

Second, these materials are critical for impeachment. Any discrepancies between contemporaneous texts or calls and later written reports or testimony constitute classic impeachment evidence under *Giglio* and must be disclosed. Likewise, any communications that cast doubt on the government's version of events, the claimed justification for the use of force, or the asserted threat posed by Mr. Jimenez are exculpatory under *Brady*.

Third, the government's discovery obligations extend to information in the possession of the prosecution team, including agents' communications about the case, regardless of device type. The government cannot unilaterally exempt personal phones from review when they have been used to communicate about the investigation.

Accordingly, the defense respectfully requests that the Court order the government to identify all agents who used government or personal phones to communicate about the incident or investigation, to collect and review those communications, and to produce all responsive materials, subject to an appropriate protective order if necessary.

Government's Position:

1. The Government Has Produced Text Messages

The government has produced all text messages it is aware of that are discoverable pursuant to the government's discovery obligations, including the group text messages and Signal messages discussed above in response to item 2.

The government is also in possession of additional messages that do not constitute Rule 16 or *Brady* materials. Such messages discuss logistical matters such as dates, times, and locations of interviews; officer contact information; and the collection of documents that the government has since produced to the defense. Although the government does not believe it is obligated to produce these messages, it has agreed to provide such text messages to the defense as a courtesy and intends to produce the messages by April 30, 2026.

2. The Agent's Personal Phones Do Not Contain Discoverable Messages

As stated in the Opposition, the government is not aware of any messages on personal phones related to the incident or JIMENEZ. (See Mejia Decl. ¶ 12; Decl. of Estevan Banuelos ("Banuelos Decl.") ¶ 6.) Special Agents Mejia and Banuelos have contacted the agents in this matter and confirmed that no agents who witnessed the incident or were involved with the investigation have such messages. Id.

*11. Any and all correspondence related to the absence or non-existence of Officer Ortiz's communications related to the incident."*

Defendant's Position:

The defense seeks any and all correspondence related to the asserted absence or non-existence of Officer Ortiz's communications concerning the incident. This includes internal government emails, memoranda, and communications with agencies or service providers addressing whether such communications exist, were searched for, or were lost or deleted.

First, correspondence about the status of Ortiz's communications is material to the defense because it bears directly on the sufficiency of the government's search, potential spoliation, and the reliability of the government's representations to the Court and the defense. If communications once existed but are now missing, the circumstances of that loss are themselves evidence.

Second, any internal recognition that relevant communications may have been deleted, overwritten, or not preserved would be highly probative for impeachment. Such information could undermine the credibility of government witnesses and the integrity of the investigation, and therefore falls within *Giglio* and *Brady*.

Third, the defense cannot meaningfully test the government's claim that Ortiz has "no responsive communications" without access to the underlying correspondence explaining how that conclusion was reached. The government cannot simply offer a bottom-line assertion while withholding the documents that reveal what was actually done.

For these reasons, the defense respectfully requests that the Court order the government to produce all correspondence and

documentation related to the asserted absence or non-existence of Officer Ortiz's communications concerning the incident.

Government's Position:

As set forth in the response to No. 12 below, Special Agent Mejia inspected Officer Ortiz's government phone in person to confirm that he had no such messages. (Dkt. No. 60.) (Mejia Decl. ¶ 10-11.) Given that the meeting took place in person, there is no correspondence on this issue.

*12. The steps the government took or plans to take to confirm that Officer Ortiz does not have any communications related to the incident*

Defendant's Position:

The defense seeks disclosure of the steps the government took, or plans to take, to confirm that Officer Ortiz does not have any communications related to the incident. This information is necessary to evaluate whether the government has conducted a reasonable and good-faith search, as required by its discovery obligations.

First, the government's duty under *Brady*, *Giglio*, and Rule 16 is not satisfied by conclusory assertions that no responsive materials exist; it must conduct an adequate search and be prepared to describe, at least in general terms, what that search entailed.

Second, the scope and methods of the government's search are directly material to the defense. If, for example, no forensic review was performed, no requests were made for carrier records, or no inquiry was made regarding cloud backups or messaging apps, that limited effort would support an argument that relevant evidence may exist but has not been located or preserved.

Third, given the central role of Ortiz in this case and the government's insistence that he has "no responsive texts," transparency about the search process is critical to maintaining the integrity of the proceedings and ensuring the defense has a fair opportunity to investigate.

The defense therefore respectfully requests that the Court order the government to detail the steps it took and plans to take to confirm the existence or non-existence of Ortiz's communications, including device searches, requests for records, and preservation efforts, and to provide that information in writing to the defense and the Court.

<u>Government's Position:</u>

Defense counsel requested in its motion that the government "conduct reasonable inquiries of immigration officer Ortiz." (Mot. at 18.) It has already done so. On February 10, 2026, the same day that videos of the other text messages were taken of Officer S. Cosey and N. Jimenez's phones, Special Agent Mejia also met with Officer Ortiz in person and reviewed his device and text messages. (Mejia Decl. ¶ 10.) Special Agent Mejia first verbally confirmed with Officer Ortiz that he had no messages. (<u>Id.</u>). Special Agent Mejia then performed a general review of the text messages in Officer Ortiz's government phone, searched specifically for the name Jimenez, and in particular reviewed all messages from October 30 and 31, and did not locate any text messages about the incident or Jimenez. (<u>See</u> <u>id.</u> ¶ 10). This is not particularly surprising given that Officer Ortiz was not part of the group text thread that officers S. Cosey, N. Jimenez, and Special Agent Mejia were a part of, and because Officer Ortiz did not create

a group text for the operation he led on October 30, 2025. (Id. ¶ 10.) Special Agent Mejia also confirmed with Officer Ortiz that he had not deleted messages on his government phone and that he had no such practice of doing so. (Id. ¶ 11.)

*13. The steps the government took to preserve any and all communications between all involved officers, agents, or witnesses in the case;*

Defendant's Position:

The defense seeks disclosure of the steps the government took to preserve any and all communications between all involved officers, agents, and witnesses in this case. Given the centrality of contemporaneous communications to the defense, what the government did (or failed to do) to preserve such evidence is itself discoverable and material.

First, once the incident occurred and a federal investigation commenced, the government was obligated to take reasonable steps to preserve relevant evidence, including digital communications. Preservation directives, litigation holds, and instructions to agents are directly relevant to whether potentially exculpatory or impeaching evidence may have been lost.

Second, if preservation efforts were delayed, incomplete, or never implemented for certain devices or accounts, that information supports a potential spoliation argument and is highly probative for impeachment under *Giglio*.

Third, the defense cannot adequately assess the completeness of discovery or the reliability of the government's representations

without understanding what preservation measures were actually undertaken across agencies.

Accordingly, the defense respectfully requests that the Court order the government to disclose, in writing, the steps it took to preserve all communications between involved officers, agents, and witnesses, including the timing, scope, and recipients of any preservation directives or litigation holds.

Government's Position:

As set forth above, the government has complied with its obligations in producing discovery in this case, which includes reports summarizing interviews, recordings, photographs, and videos/screenshots of messages on the incident. Moreover, these requests also seek information about internal government processes that are not subject to disclosure under Rule 16(a)(2).

*14. All metadata for both the government and personal phones for all agents involved in the investigation; and*

Defendant's Position:

The defense has substantially narrowed its request to two discrete categories:

(14) all metadata from the government-issued and personal phones of the four agents present during the on-scene investigation, and

(15) a description of the steps taken to preserve those communications and associated metadata.

These limitations reflect a good faith effort to tailor the request while still securing information essential to evaluating the integrity, completeness, and preservation of key evidence.

The government's objection is misplaced, and its reliance on *United States v. Murray*, No. 3:18-CR-30018-MGM-1, 2019 WL 1993785 (D. Mass. May 6, 2019), is both legally inapposite and misleading. *Murray* is a Criminal Rule 17(c) subpoena decision, not a Rule 16 discovery decision. The defendant in *Murray* sought to compel **a non-party cooperating** source to surrender his personal cell phone for forensic imaging by the defense. *Id.* at 4-5. The court's analysis was governed by the test for trial subpoenas of a third-party (relevancy, admissibility, and specificity, not investigation) and was driven overwhelmingly by the third-party privacy interests of a non-party witness in his personal device under *Riley v. California*, 573 U.S. 373 (2014). *Murray*, 2019 WL 1993785, at 5 ("A forensic copy of Giedrowicz's personal cell phone raises privacy concerns."); *id.* at 6 (denying request as a "fishing expedition" under Rule 17(c)).

None of that framework applies here. The defense is not seeking the issuance of a Rule 17(c) subpoena. It is not seeking forensic imaging of any non-party's personal device. It is making a Rule 16(a)(1)(E) request to the government for metadata associated with communications of its own agents; material that is within the government's possession, custody, or control, and that bears directly on the preparation of the defense. The government's invocation of *Murray* conflates two distinct discovery regimes and asks this Court to import Rule 17(c)'s heightened standard, and the privacy-driven balancing that accompanied it, into Rule 16, where the government carries a production burden (government has no such production burden under Rule 17). That is not a permissible reading of *Murray*, and the citation should be disregarded.

Even setting aside the Rule 16/Rule 17 mismatch, *Murray* is factually distinguishable. The *Murray* court denied the request because the defendant offered only "conclusory allegations of relevance" and failed to articulate a concrete link between metadata and the charged offenses. *Id*. at 7. The defense here has done precisely the opposite, identifying specific evidentiary functions metadata will serve and tying each to the integrity of the government's own case. *Murray* is also unreported, out-of-circuit, and a magistrate judge order, persuasive at best, and only when the underlying facts align. They do not.

In cases involving digital communications, the government routinely produces underlying metadata without the need for a specific request, typically in a structured format such as an Excel or similar data file. This request is consistent with standard discovery practice and is neither novel nor unduly burdensome, particularly in cases involving cellular phones.

Screenshots and videos are not an adequate substitute. They omit embedded data and do not allow for sorting, filtering, or analysis necessary to reconstruct timelines, identify gaps, or assess completeness. The defense does not seek duplicative surface-level information already visible in produced images. Rather, it seeks underlying forensic metadata, including deletion artifacts, message status indicators, edit histories, device-level timestamps, synchronization and backup records, and application logs. This data exists independently of message content and is the only reliable means to evaluate authenticity, storage, and preservation.

Metadata is critical here for several independent reasons. It can confirm whether communications occurred when the government claims none exist, identify previously undisclosed contacts, and reveal clusters of activity at key moments. Where content is missing or purportedly nonexistent, metadata may expose gaps consistent with deletion or inadequate preservation, supporting impeachment and potential spoliation arguments. It is also the only practical way to ensure that searches across multiple devices and platforms were complete and not selectively produced.

The request is particularly warranted given the government's position that no responsive communications exist for a central agent, despite the absence of any forensic examination of the relevant devices. A declaration alone, without testing of either government-issued or personal phones, does not permit meaningful scrutiny. Where agent communications are central to the timeline and credibility of the investigation, the lack of forensic review heightens the need for metadata, not diminishes it.

The defense has articulated a concrete, fact-driven basis for the request. Unlike cases where metadata was denied as cumulative, here the government relies on the asserted absence of communications while having conducted no forensic validation. That posture establishes materiality under Rule 16(a)(1)(E) and further confirms that the government's reliance on Rule 17(c) authority is not merely inapposite. *See United States v. W.R. Grace*, 401 F. Supp. 2d 1087, 1091–92 (D. Mont. 2005).

The request also implicates the government's constitutional obligations. Evidence reflecting deletion, selective preservation, or gaps in communications constitutes classic impeachment material and

may be exculpatory. See *California v. Trombetta*, 467 U.S. 479, 488-89 (1984); *Arizona v. Youngblood*, 488 U.S. 51, 57-58 (1988). A description of preservation efforts is therefore necessary to assess whether potentially exculpatory evidence was lost or destroyed.

Finally, the government's burden argument is conclusory. The request is limited to four identified agents, a discrete incident, and associated metadata. Extraction of such data is a routine forensic process, and any legitimate concerns can be addressed through reasonable limitations or a protective order.

At bottom, this request goes directly to the integrity of the evidence. The government's case depends in part on the absence of communications and the credibility of its agents. Metadata is the only objective means to test both. The request is narrowly tailored, consistent with standard practice, and essential to the defense's ability to evaluate the evidence and prepare its case. The Court should order production of the requested metadata and a description of preservation efforts.

<u>Government's Position:</u>

Defense counsel's request for metadata remains overbroad, unduly burdensome, and cumulative of information that defense counsel has been provided. For example, senders, recipients, dates, and times appear in the produced videos/screenshots of the produced messages. Defense counsel has not identified with specificity any particular piece of metadata for any specific document that it thinks is relevant or would like the government to further investigate. Nor has the defense articulated how that metadata is relevant or discoverable material. Absent any such specificity for such a

burdensome and duplicative request, the request for metadata is overbroad and unwarranted. See, e.g., United States v. Murray, No. 3:18-CR-30018-MGM-1, 2019 WL 1993785, at *7 (D. Mass. May 6, 2019) (unreported) (denying Rule 17(c) request for metadata where "[t]he prosecutor represented" that messages contained the "sender and recipient, the contents of the messages, and their dates and times" and defendant failed to demonstrate a "sufficient likelihood" that the associated metadata was "relevant to the offenses charged in the indictment.")

At the April 28, 2026 meet and confer, defense counsel did not identify any specific message or document for which metadata is being requested or specific field that they might be interested in. The government remains open to meeting and conferring with defense counsel if there is a request for a specific document.

*15. The steps the government took to preserve all correspondence and related metadata;*

Defendant's Position:

The defense seeks disclosure of the steps the government took to preserve all correspondence and related metadata concerning the incident and investigation. This request complements Requests 13 and 14 and focuses specifically on efforts to preserve not just content but also the associated metadata.

First, preservation of metadata is critical because it can be altered or lost through routine device use, software updates, or collection methods. The government's obligations under *Brady*, *Giglio*, and Rule 16 include taking reasonable measures to preserve evidence in a manner that maintains its evidentiary value, including metadata.

Second, documentation of what the government did to preserve correspondence and metadata is material to assessing whether the discovery process has been adequate or whether the loss of data may have prejudiced the defense.

Third, transparency about preservation efforts is especially important here, where the government has represented that certain key communications (such as Ortiz's texts) do not exist. Without knowing what preservation measures were taken, the defense cannot determine whether the absence of evidence is genuine or the product of inadequate preservation.

Accordingly, the defense respectfully requests that the Court order the government to describe, in writing, the steps it took to preserve all correspondence and related metadata, including any instructions to agents, technical measures implemented, and any known limitations or failures in those efforts.

<u>Government's Position:</u>

*See* responses to No. 14 and 15.

*16. Any information regarding the lack of recording of Officer Ortiz's interview.*

<u>Defendant's Position:</u>

The defense seeks any information regarding the lack of recording of Officer Ortiz's interview. Given Ortiz's central role as the ICE agent who fired his weapon and is expected to be a key government witness, the government's decision not to record or failure to record) his interview is highly material to the defense.

First, information about why Ortiz's interview was not recorded, whether recording was standard practice, and who made that decision bears directly on the reliability and completeness of the resulting statements. If the government deviated from normal practice or policy by declining to record, that deviation is classic impeachment material under *Giglio*.

Second, any internal communications, memoranda, or policies explaining the lack of recording may reveal concerns about the content of Ortiz's statements, inconsistencies with other evidence, or efforts to limit the creation of discoverable material. Such information is both exculpatory and impeaching within the meaning of *Brady* and *Giglio*.

Third, the absence of a recording places heightened importance on notes, summaries, and recollections prepared by agents or prosecutors. Information about how those notes were created, whether drafts were revised, and whether any portions were omitted is therefore material to cross-examination and to assessing the credibility of Ortiz's anticipated testimony.

For these reasons, the defense respectfully requests that the Court order the government to disclose all information and documentation regarding the lack of recording of Ortiz's interview, including applicable policies, internal communications about whether to record, and any notes, drafts, or summaries generated in lieu of a recording.

<u>Government's Position:</u>

As the government has informed defense counsel, Officer Ortiz's interview was led by the FBI, rather than HSI. FBI has no requirement that its agents always record interviews and FBI SA Banuelos's

general practice is not to record interviews. (Banuelos Decl. ¶ 7.) Indeed, Ortiz was not the only interview led by FBI that was not recorded in this case. For example, witnesses Manuel Villareal and Beatrice Morales were also interviewed by FBI, but their statements were not recorded. See, e.g., USAO_00000646. In this matter, numerous interview recordings were made and subsequently produced because many of the HSI agents who were involved in some interviews did have a practice of recording interviews. Neither Officer Ortiz nor his counsel made any request that the interview not be recorded. (Banuelos Decl. ¶ 8; Mejia Decl. ¶ 21.)

## II. Resolved issues

*1. the personnel files of all officers or agents involved in this case and anticipated to testify, pursuant to United States v. Henthorn, 931 F.2d 29 (9th Cir. 1990), which requires, upon request, that the government inspect the personnel files of its law enforcement officer witnesses and turn over impeachment material*

As stated in the Opposition, the Government has stated that it will produce its *Henthorn* disclosure by Friday, May 1, 2026. Defense counsel will review.

*9. We request a list of all HSI, EVRO, and USCBP agents involved in the investigation (e.g. USAO_752 re: FBI agents).*

The parties agree that the Government has produced the requested list.